**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Mary Ann Whipple
United States Bankruptcy Judge

**Dated: August 29 2013**

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 11-35180 |
| | ) | |
| Klosterman Development, Inc., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | JUDGE MARY ANN WHIPPLE |

## ORDER DENYING MOTION FOR CRAMDOWN AND CONFIRMATION OF PLAN

This case came before the court for evidentiary hearing on Debtor's motion for cramdown and for confirmation of its Second Amended Chapter 11 Plan [Doc. # 173] and supplement to the motion [Doc. # 179] (jointly, "Motion"), objections to confirmation and to Debtor's Motion filed by Mercer Savings Bank [Doc. #154, incorporating Doc. # 133], Hillside North Homeowner's Association ("Homeowners' Association") [Doc. ## 157 & 174], and Mercer County [Doc. ## 175 & 210], and Debtor's responses [Doc. ## 180 & 211]. Debtor's principal, Steven Klosterman, counsel for Debtor, counsel for Mercer County, and counsel for the Homeowner's Association all attended in person. Counsel for the United States Trustee attended by telephone. For the reasons that follow, Debtor's motion for cramdown and for confirmation of its Second Amended Chapter 11 Plan will be denied.

## PROCEDURAL AND FACTUAL BACKGROUND

Steven Klosterman owns all of the shares of stock in Debtor. Prior to filing bankruptcy, Debtor was engaged primarily in the business a developing and building homes on real estate it had purchased around

Grand Lake St. Marys in Mercer County, Ohio. Due, at least in part, to manure runoff from nearby farms, the lake water became contaminated, and approximately three years ago, high levels of blue-green algae appeared in the lake. As a result, the real estate owned by Debtor did not sell, causing financial difficulties that led to a receiver being appointed in state court and ultimately to the filing of this Chapter 11 case. On a post-petition basis, Debtor is no longer in the business of developing real estate. While Debtor engages in some miscellaneous construction jobs, it is primarily engaged in what Klosterman describes as the material handling business of processing sand, concrete, fill dirt and top soil for resale.

Real estate that Debtor had been developing includes the Hillside North Subdivision in Mercer County, which includes South Lake Court Road, a private road in the subdivision. Steven Klosterman ("Klosterman") testified regarding the building of roads in a subdivision in Mercer County. In Mercer County, developers are directed by the county engineer to install sewers and a two-inch asphalt base but wait to install the final coat of asphalt until eighty percent of the homes in the development are built in order to avoid road damage caused by cement trucks during the building process. Klosterman testified that the lots in the Hillside North Subdivision are not selling due to the algae problem and some of those that previously sold were purchased for retirement and the buyers have not yet built on them. To date, only six homes have been built on the twenty-seven lots in the Hillside North Subdivision. Thus, although Debtor completed installation of sewers and the base coat on South Lake Court Road, the final coat has not be completed and no further work has been done on the road for over ten years.

Debtor had furnished assurance to Mercer County that the road would be constructed as required by its regulations by providing it an irrevocable letter of credit. Mercer County, however, never called the letter of credit and it has expired. Klosterman testified that Debtor never received a notice from Mercer County that the unfinished road constitutes a nuisance, and further testified that Debtor now has no ability to complete the road, which he estimates would cost between forty and sixty thousand dollars.

Mercer County did not file a proof of claim in this case with respect to the unfinished road.[1] However, the Hillside North Homeowner's Association ("Homeowner's Association"), on behalf of property owners on South Lake Court Road, did file a proof of claim in the amount of $55,000, representing the estimated cost of completing the road. Jeffrey Markum ("Markum"), a representative of the Homeowner's Association, testified regarding the condition of the road. He testified that there are cracks

---

[1] The only proofs of claim filed in this case by Mercer County were filed by the Mercer County Treasurer with respect to real estate taxes owed by Debtor. [*See* Proofs of Claim ## 22 -25].

2

in the pavement and that, because construction of the road has not been completed, sewer lids remain several inches above the pavement. He also testified that potholes in the road have been repaired by Debtor. Markum testified that ownership of the road, once completed, is to be turned over to the Homeowner's Association. Although Debtor's originally filed Chapter 11 Plan provided that South Lake Court Road, together with a boat ramp that is part of the Hillside North Subdivision project, be distributed to the South Lake Court Road property owners in full satisfaction of their claim, Markum testified that the property owners are not willing to accept the road in its unfinished state due to liability issues.

Debtor filed a Second Amended Chapter 11 Plan ("Plan"), establishing ten classes of claims and interests. [Doc. # 152]. After transmitting the Plan to all creditors and security interest holders, on December 5, 2012, Debtor filed a Declaration of Tabulation of Ballots showing that Classes 1, 2 and 8 rejected the Plan, that Classes 3 and 7, which address impaired claims of secured creditors Pear Investments and D&J Farms, voted to accept the Plan, and that no votes were received with respect to impaired Classes 4 and 5, addressing the impaired claims of Farm Credit Services of Mid-America and claims relating to unfinished subdivisions, respectively. [Doc. # 164]. Nevertheless, Farm Credit Services filed an objection to the Plan that has been resolved pursuant to an agreed order entered that modifies the Plan with respect to treatment of its claim.[2] [*See* Doc. ## 160 & 201]. In addition, the Homeowner's Association, whose claim is included in Class 5, filed an objection to confirmation. Finally, Classes 6, 9 and 10 are unimpaired and, thus, are deemed to have accepted the Plan. *See* 11 U.S.C. § 1126(f).

Under Class 5 of the Plan, except for claims for real estate taxes, all other claims of any nature relating to the South Lake Court Road are to be treated as unsecured claims under Class 8. [Doc. # 152, ¶ 5(a)(iii)]. The Plan further provides with respect to South Lake Court Road as follows: "No claims of any kind nor shall [sic] any obligation or duty against the Debtor that existed as of the date of the commencement of this case shall survive confirmation of the Plan."

Class 2 consists of claims of the Auglaize County, Ohio, Treasurer and the Mercer County, Ohio, Treasurer with respect to real property taxes owed by Debtor. The Plan provides that "[a]ny taxes assessed, but not yet due shall be paid as they accrue" and "[a]ny delinquent taxes shall at the option of the Debtor be either paid in full as of the date of confirmation or shall at confirmation bear interest at the rate of Five percent (5%) and be paid in five equal annual installments on the anniversary date of confirmation of the

---

[2] Debtor has recently submitted another agreed order further modifying the Plan with respect to treatment of Farm Credit Services' claim. Because Debtor's motion for cramdown and for confirmation is being denied, that order has not been signed.

3

Plan." [Doc. # 152, ¶ 3.3(2)(b)].

As set forth in the Plan, Class 1 consists of the secured claim of Mercer Savings Bank ("the Bank"). In its proof of claim, the Bank asserts a secured claim in the amount of $314,364.39. Debtor objected to the amount of the secured claim in light of post-petition payments made on account of the claim. [Doc. # 169]. Although the Plan originally provided that the Bank's claim was a partially secured claim and proposed establishing the amount of the claim at $250,000.00 to be amortized over twenty years and paid in equal monthly installments with a balloon payment due within two years, the Bank elected under 11 U.S.C. § 1111(b) to be treated as a fully secured creditor and objected to the Plan on grounds that it was not feasible.

Class 8 consists of allowed unsecured claims. At the time the Plan was filed, the Bank held, in addition to its secured claim, two unsecured claims totaling $262,900.66. The Plan as originally filed provided that unsecured creditors would receive 2% of their allowed claims, without accrual of interest, to be paid to each claim holder every six months in an amount equal to 1/15 of the amount to which it is entitled until paid in full, commencing within 180 days of the effective date of the Plan. [Doc. # 152, ¶ 8(b)].

In an attempt to resolve the Bank's objection to and rejection of the Plan, on December 10, 2012, Debtor filed a Motion to Modify Plan. [Doc. # 171]. Specifically, Debtor moved to modify treatment of the Class 1 secured claim of the Bank as follows:

> The [Bank's] Claim shall be paid in full as set forth hereafter and the lien securing the [Bank's] Claim shall survive confirmation of the plan.
>
> The [Bank's] Claim shall bear interest at a fixed rate of 5% until paid in full. Upon being established by the Court, the [Bank's] Claim including interest shall be paid in full in cash on the 15th day following the entry of an order. Upon payment of the [Bank's] Claim, [the Bank] shall immediately cause the release of its mortgage and or liens of record as to the Real Property.

[*Id.* at 3]. In addition, Debtor moved to modify treatment of the Class 8 unsecured claims to provide that claim holders receive 2% of their allowed claims, with payment to be made on or before thirty days after confirmation of the Plan or within 15 days of a claim being proved and allowed. [*Id.* at 4]. According to Debtor, this would require a cash disbursement of $14,000.00 to unsecured creditors. In support of the Motion to Modify Plan, Debtor submitted the affidavit of Klosterman's father, Omer Klosterman, stating that, as the sole trustee of the Omer R. Klosterman Revocable Trust ("the Trust"), he had committed to loaning Debtor $328,000.00 if necessary in furtherance of confirmation of a plan, subject only to his son's

agreement to co-sign for such loan. [Doc. # 168, attached Aff.]. Debtor also submitted a certification by Chase Bank that a sufficient amount of money was on deposit in the Trust account. [*Id.*, attached Certification].

On December 18, 2012, the Bank filed evidence that it unconditionally transferred to the Trust not only its secured claim but also both of its unsecured claims, and the Trust was substituted for the Bank on the claims register. [Doc. ## 176, 177 & 178]. On December 19, 2013, an agreed order was entered, stating that the court having been advised that the amount paid for the Bank's secured claim that was transferred to the Trust was $300,000.00, the amount of the claim under Class 1 "for purposes of the proposed modification" is established and allowed in the amount of $300,000.00. [Doc. # 182]. On January 14, 2013, after hearing on the motion, the court entered an order granting the motion to modify the Plan. [Doc. # 207].

At the February 6, 2013, hearing on Debtor's motion for cramdown and confirmation of the Plan, Debtor offered a Liquidation Analysis [Debtor's Ex. 1] with respect to which Klosterman testified. The Liquidation Analysis, the bottom line of which was unchallenged, projects insufficient funds to pay priority claims in full, showing a negative $7,500.00 balance after such expenses are accounted for, and thus no distribution to unsecured creditors in the event Debtor is liquidated as compared to a projected Plan distribution to unsecured creditors in the amount of $14,000.00. [*Id.*].

Klosterman testified that the mortgage debt in the amount of $350,000.00 shown in the Liquidation Analysis as being secured by real estate consisting of five acres of land on which Debtor's office is located, which is designated as the Office Location, is owed to Omer Klosterman, or more accurately, to his Trust. Before transfer of the Bank's secured claim to the Trust, the Office Location secured the debt owed to the Bank. The Liquidation Analysis shows that Debtor values the Office Location at $316,000.000. As discussed above, the amount of the Trust's secured claim has been established at only $300,000.00, thus resulting in Debtor's equity in the property in the amount of $16,000.00. Adding this amount to the negative $7,500.00 balance stated above would then more accurately result in priority claims being paid in full with $8,500.00 available for distribution to unsecured creditors as compared to the projected Plan distribution of $14,000.00.

The Liquidation Analysis also shows that Debtor has no equity in any other real estate or equipment owned by it. Klosterman testified that a $50,000.00 debt shown as being secured by the equipment owned by Debtor is a debt owed to Omer Klosterman and represents post-petition borrowing and granting of a lien

authorized by the court. [*See* Doc. # 84]. This claim of Omer Klosterman constitutes Class 6 under the Plan. It is to be paid at 5% interest over a sixty-month term and is classified as unimpaired without challenge. [Doc. # 152, p. 10, ¶ 3.3(6)].

Class 10 under the Plan consists of the stock interest of Steven Klosterman. The Plan provides that it "shall not alter" such interest and that "Steven Klosterman will in order to comply with the rule of absolute priority invest such funds as are necessary to provide for the payment of administrative and priority claims." [*Id.* at p. 12, ¶ 3.3(10)]. However, at the confirmation hearing, Klosterman testified that Debtor has no ability to borrow money other than the loans provided by his father's Trust and that Debtor will fund the Plan with cash obtained from the Trust. At the hearing, counsel for Debtor represented to the court that a $400,000.00 note ("Note"), consolidating the $50,000.00 loan from Omer Klosterman and a $350,000.00 loan from the Trust, is to be signed by Debtor and co-signed by Steven Klosterman. Counsel stated that the Note is a demand note, with interest at 3.5% or 4.5% to be paid annually. Counsel further stated that $25,000.00 will be needed to fund the Plan and that such funds are part of the $350,000.00 that, according to Klosterman, has already been borrowed from the Trust. The record is not clear as to whether Debtor or Klosterman borrowed the $350,000.00 since, as of the date of the hearing, Debtor had not requested, and the court has not granted, authority to borrow such funds. Nevertheless, Klosterman testified that the loans from his father and the Trust are secured by liens on all of Debtor's assets.

## LAW AND ANALYSIS

Congress set forth requirements for confirmation of a Chapter 11 plan in 11 U.S.C. § 1129(a)(1) through (16). The plan proponent must demonstrate that the plan meets each applicable requirement, with the exception of § 1129(a)(8). That section sets forth a requirement that each class of claims or interests have either accepted the plan or are not impaired under the plan. 11 U.S.C. § 1129(a)(8). Notwithstanding that requirement, a plan may still be confirmed on request of the proponent of the plan "if all of the applicable requirements of [§ 1129(a)] other than paragraph (8) are met with respect to [the] plan" and "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1).

The court discusses the relevant provisions of § 1129 below and concludes that Debtor has not demonstrated that the requirements for confirmation have been met.[3] *See Everett v. Perez (In re Perez)*, 30 F.3d 1209, 1213-14 (9th Cir. 1994) (stating that, notwithstanding no objection was filed, in seeking

_____

[3] Subsections 1129(a)(6), 13, 14, 15 and 16 are not applicable to Debtor's reorganization Plan.

confirmation and representing that the plan complies with all applicable provisions of Title 11, a plan proponent placed such compliance squarely before the court and the court was required to satisfy itself that such was the case); *In re Stigliano*, 483 B.R. 303, 305 (Bankr. W.D. Pa. 2012) ("Court has an independent duty to satisfy itself that the requirements of Section 1129 have been met before confirming a plan."); *In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 458 (Bankr. S.D. Ohio 2011) (same).

## I.  Confirmation Requirements under § 1129(a)

### A.  § 1129(a)(1) - Plan Compliance with Applicable Provisions of Title 11

Debtor has not demonstrated that the proposed Plan complies with the applicable provisions of Title 11. While on its face, the Plan appears to comply with the applicable provisions of §§ 1122 and 1123, there is ambiguity that exists regarding treatment under the Plan with respect to Class 1 secured claim of the Bank and the Bank's two Class 8 unsecured claims such that the court cannot find that Debtor has adequately specified the treatment of such classes of claims as is required under § 1123(a)(3).

All of the Bank's claims have been transferred to the Trust. In accordance with the proposed Plan, as modified by the court's order entered on January 14, 2013, the Bank's secured claim is to be paid in full in cash on the fifteenth day following entry of an order establishing the claim. On December 19, 2013, the court entered an order establishing the allowed amount of the Bank's secured claim at $300,00.00. Because a provision of the Plan cannot be effective until the Plan has been confirmed, and because more than fifteen days has already transpired, the requirement to pay the secured claim that is the subject of Class 1 would arise on the effective date of the Plan. Although the Trust has purchased the Bank's claim, on the record before the court, the claim has not been satisfied; it has simply been transferred to the Trust. Thus, under the terms of the Plan, as modified, the Trust would be entitled to payment of the transferred secured claim in full in cash on the effective date of the Plan.

Notwithstanding these provisions, according to Klosterman and his counsel, the Trust has already loaned $350,000.00 to Debtor and a $400,000.00 Note consolidating this loan with the $50,000.00 post-petition loan from the Trust that was previously authorized by the court is to be signed by Debtor and co-signed by Klosterman. While the court assumes that Debtor's intent was to refinance the prior $50,000.00 loan from the Trust, which is otherwise provided for under Class 6 of the Plan, and the Bank's claim or claims, this pre-confirmation borrowing is not addressed in the Plan. It is thus unclear what is required of Debtor under the terms of the Plan with respect to payment of the $300,000.00 secured claim. It is also unclear how the loans from the Trust and any subsequent obligation to repay such loans impacts the Trust's

7

entitlement to participate in distributions as an unsecured creditor of claims purchased from the Bank. Such ambiguities preclude a finding that the plan complies with § 1129(a)(1).

**B.    § 1129(a)(2) - Plan Proponent's Compliance with Applicable Provisions of Title 11**

The court finds that Debtor as the Plan proponent has complied with applicable requirements under the Bankruptcy Code and, specifically, duties set forth under § 1116 and the requirements relating to disclosure and solicitation of votes from holders of claims set forth under § 1125. While certain events, such as additional pre-confirmation borrowing, and several modifications to the Plan have occurred since a disclosure statement was provided to claim holders, disclosure of such events and modifications were made to relevant interested parties.

**C.    § 1129(a)(3) - Plan has been Proposed in Good Faith**

The court may confirm a plan only if "[t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Under the plain language of the statute, it is the plan's *proposal* that must be (1) in good faith, and (2) not by any means forbidden by law. *See In re Food City, Inc.*, 110 B.R. 808, 811 (Bankr. W.D. Tex. 1990); *In re Dow Corning Corp.*, 255 B.R. 445, 498 (E.D. Mich. 2000).

A plan is proposed in good faith if "the plan was proposed with 'honesty and good intentions' and with 'a basis for expecting that a reorganization can be effected.'" *Kane v. Johns-Manville* Corp., 843 F.2d 636, 649 (2d Cir. 1988) (quoting *Koelbl v. Glessing (In re Koelbl)*, 751 F.2d 137, 139 (2d Cir.1984)); *accord Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 802 (5th Cir. 1997); *In re 20 Baird Views, LLC,* 445 B.R. 83, 95 -96 (Bankr. E.D.N.Y. 2011); *In re Eagle-Picher Indus., Inc.,* 203 B.R. 256, 274 (S.D. Ohio 1996). The Homeowner's Association's good faith challenge is based on its argument that the property owners on the unfinished South Lake Court Road purchased their properties in reliance upon the commitment of Debtor to comply with what it describes as obligations under an executory contract to complete the development, including the road, and that Debtor is maintaining ownership of the road but not complying with its contractual obligations. Mercer County's good faith challenge is based on its argument that Debtor's characterization of its obligations under the County's subdivision regulations as an executory contract is not made in good faith.

Initially, the court notes that Debtor's reference to an executory contract with Mercer County was made in its response to the Homeowner's Association's objection and stated only that *if* an agreement exists, it is with Mercer County and "it is clear that under the Plan treatment [of] any such claim *if being asserted*

8

*as an executory contract* is being rejected. . . .” [Doc. # 180, p. 5]. Debtor has also argued that Mercer County has a claim under the County's Subdivision Regulations. In any event, the arguments of both Mercer County and the Homeowner's Association are arguments relating to the proposed treatment under the Plan of any claims they may have. The "good faith" arguments advanced do not address Debtor's good faith in proposing the Plan.

The court finds that Debtor's plan was proposed in good faith, that is, it was proposed with the honest intention that a reorganization could be effected. Although the Plan provides that Debtor maintain ownership of South Lake Court Road, that provision was included only after the refusal of both the Homeowner's Association and Mercer County to accept such ownership.

Mercer County also argues that the proposed Plan provision that any obligation that exists to complete South Lake Court Road will not survive confirmation is in contravention of the County's subdivision regulations. However, the focus of a determination under § 1129(a)(3), including the second prong – that a plan is not proposed by any means forbidden by law, is the *proposal* of the Plan, as opposed to the contents of the Plan. *See, e.g., In re Frascella Enter., Inc.*, 360 B.R. 435, 445-46 (Bankr. E.D. Pa. 2007); *In re Dow Corning Corp.*, 244 B.R. 673, 675-76 (Bankr. E.D. Mich. 1999); *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 59-60 (Bankr. S.D.N.Y. 1990). Therefore, to the extent that Mercer County's argument is brought under § 1129(a)(3), it is not well taken, and the court finds that the Plan was proposed in good faith and not by any means forbidden by law.

**D.      § 1129(a)(4) - Court Approval of Certain Payments as Reasonable**

Section 1129(a)(4) requires that any payment to be made by Debtor "for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by , or is subject to the approval of, the court as reasonable." 11 U.S.C. § 1129(a)(4). Under the proposed Plan, all payments to professionals "shall be paid in cash to the extent allowed by the Bankruptcy Court upon Application." [Doc. # 152, ¶ 3.1(c)].      The Plan thus satisfies the requirement under § 1129(a)(4).

**E.      § 1129(a)(5) - Disclosure of Identity of Proposed Management**

The proposed Plan and the Disclosure Statement disclose that Steven Klosterman is the sole owner and manager of Debtor and that no change in such interests will occur under the Plan. The continued management by Klosterman is consistent with the interest of creditors. The court finds that the Plan satisfies the requirements under § 1129(a)(5).

9

**F.      § 1129(a)(7) - Best Interest of Creditors**

With respect to each impaired class of claims or interests, §1129(a)(7) requires that:

(A) each holder of a claim or interest of such class –
      (i) has accepted the plan; or
      (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [Title 11] on such date; or

(B) if section 1111(b)(2) of [Title 11] applies to the claims of such class. each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

11 U.S.C. § 1129(a)(7).

Section 1129(a)(7) applies only with respect to "impaired" classes of claims and interests, as that term is defined in § 1124. The following classes of claims were impaired at the time balloting of creditors occurred: Classes 1, 2, 3, 4, 5, 7 and 8. Classes 3[4] and 7 voted to accept the plan, and Class 4, which consists of the claim of Farm Credit Services of Mid-America, has also accepted the proposed Plan as modified by the agreed order entered resolving its objection to confirmation.

With respect to Class 1, which consists of the Bank's secured claim now held by the Trust, § 1129(a)(7)(B) is applicable to the extent the claim is impaired given the Bank's § 1111(b)(2) election, which has not been withdrawn by the Trust. Debtor, however, argues that the claim is no longer impaired since the proposed Plan, as modified by the court's January 14, 2013, order, now provides that the claim be paid in full in cash, which, as discussed above, would be due on confirmation since the court has already determined the amount of the claim. Alternatively, Debtor seeks to permit the Trust to recast the ballots formerly cast by the Bank in order to accept treatment of its claim under Class 1. While the court notes that a claim may be impaired within the meaning of § 1124 even where the claimant's position is improved if the claimant's legal, equitable, or contractual rights are altered, *see,* 11 U.S.C. § 1124(a)(1); *L&J Anaheim Assocs. v. Kawasaki Leasing Int'l (In re L&J Anaheim Assocs.),* 995 F.2d 940, 942 (9th Cir. 1993); *In re Union Meeting Partners,* 160 B.R. 757, 771 (Bankr. E.D. Pa. 1993), the court need not determine whether the Class 1 claim is impaired or the ballot is properly recast since treatment of the claim in the modified Plan

---

[4]Debtor has filed a separate Motion for Authority to Sell Property Free and Clear of Liens and submitted a proposed order granting the motion in furtherance of the treatment of Pear Investments, LLC's claim under Class 3 of the Plan. [Doc. # 219]. Because Debtor's motion for cramdown and confirmation is being denied, that order also has not been signed by the court.

satisfies § 1129(a)(7)(B) in any event as the Plan provides for payment of the claim in full at confirmation.

Class 5 consists of unsecured claims arising from Debtor's uncompleted subdivisions. The Plan proposes that all such claims be treated under Class 8, which consists of allowed unsecured claims. Under Class 8, the Plan, as modified by the court's January 14, 2013, order, proposes to pay all unsecured creditors 2% of their allowed claims within thirty days of confirmation of the Plan or fifteen days of a claim being proved and allowed. Debtor estimates such payment to total approximately $14,000.00, whereas under Debtor's Liquidation Analysis, adjusted as discussed above, only $8,500.00 would be available for distribution to unsecured creditors in a Chapter 7 case. Thus, treatment of claims under Classes 5 and 8 meet the best interest of creditors test.

Class 2 consists of the claims of the Auglaize County Treasurer and the Mercer County Treasurer for delinquent property taxes. The Plan states that no claims have been filed by either Treasurer and that Debtor believes that all taxes are current for real property being retained by Debtor in Auglaize County and that a total of $14,855.09 is owed for delinquent taxes in Mercer County. [Doc. # 152, ¶ 3.3(2)(a)]. However, the Auglaize County Treasurer filed a proof of claim for delinquent real estate taxes in the amount of $35,590.49 and the Mercer County Treasurer filed four proofs of claim for delinquent real estate taxes totaling $23,612.63. [Proofs of Claim ## 22-25, 27].[5] No objection to these claims have been filed.

The Plan proposes to pay property taxes assessed but not yet due as they become due and, at Debtor's option, to pay "any delinquent taxes" either in full as of the date of confirmation or in five equal annual installments at five percent interest on the anniversary date of confirmation of the Plan. [*Id.* at ¶ 3.3(2)(b)]. Alone and on its face, paragraph 3.3(2)(b) appears to meet the best interest of creditors test even if Debtor would elect to pay the delinquent taxes in installments given the fact that the amount owed would bear interest at the rate of five percent and given the fact that the provision refers to "any" delinquent taxes.[6] However, read in conjunction with paragraph 3.3(2)(a)'s statement regarding the amount owed for delinquent property taxes, the court finds that Debtor has not shown that the Plan meets the requirement that

---

[5] The court takes judicial notice of the contents of its case docket and the claims register in Debtor's case. Fed. R. Bankr. P. 9017; Fed. R. Evid. 201(b)(2); *In re Calder*, 907 F.2d 953, 955 n.2 (10th Cir. 1990); *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1171-72 (6th Cir. 1979) (stating that judicial notice is particularly applicable to the court's own records of litigation closely related to the case before it).

[6] The Ohio Revised Code provides for interest on delinquent property taxes at an annual rate as prescribed in § 5703.47. Ohio Rev. Code § 323.121(B)(1). Pursuant to § 5703.47, the Ohio Tax Commissioner has determined that the interest rate to be applied in 2012 and 2013 is 3%. *See* www.tx.ohio.gov/ohio_individual/individual/interest_rates.aspx; *see also* Proof of Claim # 22 and attached Admin. Journal Entry.

the Auglaize and Mercer County Treasurers will receive "on account of [their] claim[s]" an amount not less than the amount that they would receive if Debtor were liquidated and, thus, has not shown that the Plan satisfies the requirement of § 1129(a)(7).

**G.      11 U.S.C. 1129(a)(8) - Acceptance of Plan by Each Impaired Class**

Section 1129(a)(8) requires that, with respect to each class under a plan, such class has either accepted the plan or is not impaired under the plan.  11 U.S.C. .§ 1129(a)(8).  Class 2 is impaired and voted to reject the Plan.  Claim holders in Class 5, also an impaired class, did not vote on the Plan and, thus, did not accept the Plan.  *See In re Eagle-Picher Indus., Inc.,* 203 B.R. at 275.  Thus, § 1129(a)(8) is not satisfied, notwithstanding Debtor's attempt to recast ballots with respect to Class 1 and 8 formerly cast by the Bank in order to effect an acceptance of the Plan by those classes.

**H.      11 U.S.C. § 1129(a)(9) - Treatment of Certain Priority Claims**

Section 1129(a)(9) provides in relevant part as follows:

 Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that--
. . . .

(C) with respect to a claim of a kind specified in section 507(a)(8) of this title, the holder of such claim will receive on account of such claim regular installment payments in cash--

> (i) of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

> (ii) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and

> (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b))[convenience class]; and

(D) with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in subparagraph (C).

11 U.S.C. § 1129(a)(9)(C) & (D).

Section 507(a)(8) specifies, in relevant part, a claim for "a property tax incurred before the commencement of the case and last payable without penalty after one year before the date of the filing of the petition."  11 U.S.C. § 507(a)(8)(B).  Both the Auglaize County Treasurer and the Mercer County

12

Treasurer have filed secured claims for property taxes incurred before the commencement of the case. The court cannot determine on the record before it whether the delinquent taxes were last payable without penalty after one year before the date of the filing of the petition or the amount of such taxes. The court, therefore, cannot determine whether the Plan complies with § 1129(a)(9)(D). To the extent that the property tax claims are claims as specified in § 507(a)(8), the Plan is required to provide payment over a period ending not later than five years after the date of the order for relief. However, the Plan gives Debtor the option of paying the delinquent taxes in annual installments over five years from the date of confirmation of the Plan rather than from the date that Debtor's petition was filed. The court, therefore, concludes that Debtor has not met its burden of showing that the Plan meets the requirements of § 1129(a)(9)(D).

**I.      § 1129(a)(10) - Acceptance by at Least One Impaired Class of Claims**

Section 1129(a)(10) provides that at least one class of claims that is impaired under the plan must accept the plan, determined without including any acceptance of the plan by any insider. 11 U.S.C. § 1129(a)(10). Both impaired Classes 3 and 7 have voted to accept Debtor's proposed Plan. The Plan thus satisfies the requirement of § 1129(a)(10).

**J.      § 1129(a)(11) - Plan is Feasible**

Section 1129(a)(11) requires that confirmation of the Plan is not likely to be followed by the liquidation or further financial reorganization of Debtor unless such liquidation or reorganization is provided in the Plan. A proponent of a Chapter 11 plan need not show that the plan's success is guaranteed. *In re Arts Dairy, LLC*, 432 B.R. 712, 717 (Bankr. N.D. Ohio 2010). Rather, "only a reasonable assurance of commercial viability is required to establish feasibility for purposes of § 1129(a)(11)." *Id.* (citing *In re Briscoe Enter., Ltd., II*, 994 F.2d 1160, 1166 (5th Cir. 1993)).

Klosterman testified that $25,000.00, which includes $14,000.00 to be paid to unsecured creditors, is needed to fund Debtor's proposed Plan and that such funds will be provided Debtor in the form of a loan from the Trust. However, given the lack of clarity as to the amount of the real estate tax claims to be paid under the Plan as discussed above, and the representation at the confirmation hearing regarding Debtor's $400,000.00 repayment obligation to the Trust at 3.5% or 4.5% interest payable annually, Debtor has not met its burden of demonstrating the feasibility of the Plan. The repayment obligation to the Trust as to interest alone will amount to $14,000.00 (at 3.5%) or $18,000.00 (at 4.5%) annually, while Debtor's most recent monthly operating report shows Debtor's net income since filing its petition in September 2011 to be only $12,527.17. Debtor has not otherwise addressed the feasibility of its Plan. On the record before

13

it, the court cannot find that confirmation of the proposed Plan is not likely to be followed by the liquidation or further reorganization of Debtor.

### K. § 1129(a)(12) - Payment of Bankruptcy Fees

Section 1129(a)(12) provides that all fees payable under 28 U.S.C. § 1930 have been paid or the plan provides for the payment of all such fees on the effective date of the plan. Section 1930 sets forth bankruptcy filing fees and provides for other miscellaneous fees and quarterly fees payable to the United States Trustee. Debtor has paid the filing fee and any relevant miscellaneous fees in this case and, has paid all quarterly fees payable to the United States Trustee through January 31, 2013. To the extent that additional fees accrue after January 31, 2013, the proposed Plan provides that the United States Trustee shall be paid in cash on the effective date of the Plan and the Reorganized Debtor shall continue to pay post confirmation quarterly fees to the United States Trustee until the case is closed, converted to a Chapter 7 case or dismissed. [Doc. # 152, ¶ 3.1(b)]. The requirements of § 1129(a)(12) are thus met.

## II. Cramdown under 11 U.S.C. § 1129(b)

Debtor has not met its burden of showing that the requirements of subsections 1129(a)(1), (7), (8), (9) and (11) are met. However, even if all requirements of § 1129(a) are met except the requirement of acceptance of the Plan by each class set forth in § 1129(a)(8), Debtor's proposed Plan does not meet the "cramdown" requirement of § 1129(b) that the plan be "fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). Debtor argues that the court need not consider cramdown with respect to Classes 1 and 8 since the Trust has recast the ballots in those classes such that both classes should be deemed to have accepted the Plan. However, even assuming such acceptance, neither Class 2 nor Class 5 have accepted the Plan. Debtor, as proponent of the Plan, has the burden of showing by a preponderance of the evidence that the requirements of § 1129(b)(1) have been satisfied as to these two classes. *In re Dow Corning Corp.*, 244 B.R. 705, 710 (Bankr. E.D. Mich. 1999).

### A. Secured Property Tax Claims

Class 2 consists of the secured property tax claims of the Auglaize and Mercer County Treasurers. With respect to a class of secured claims the condition that a plan be fair and equitable includes the requirement that "the holders of such claims retain the liens securing such claims" and that each claimant "receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property." 11 U.S.C. § 1129(b)(2)(A)(i). According to Debtor, the Plan's treatment

14

of claims in Class 2 is fair and equitable because the claimants will retain their liens in the real property and because the Plan satisfies the requirement under § 1129(a)(9)(C) that claimants receive regular installment payments in cash of a total value, as of the effective date of the plan, equal to the allowed amount of their claims. However, as discussed above, there is ambiguity in the Plan as to what amount the Auglaize and Mercer County Treasurers will receive on account of their property tax claims comprising Class 2 such that Debtor has not met its burden of showing that the requirements of § 1129(a)(9)(C) are met.

### B. Absolute Priority Rule

Class 5 includes the claim of the Homeowner's Association and other claims relating to Debtor's unfinished subdivision, all of which are to be treated under the Plan as unsecured claims under Class 8. With respect to a class of unsecured claims, the condition that a plan be fair and equitable includes the following requirements:

> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property. . . .

11 U.S.C. § 1129(b)(2)(B). Under this subsection, the provisions of which are referred to as the "absolute priority rule," a class of equity holders "cannot receive or retain any property on account of its interest unless unsecured creditors either accept the plan or are paid in full with interest." *Sunflower Racing, Inc. v. Mid-Continent Racing & Gaming Co. I (In re Sunflower Racing, Inc.)*, 226 B.R. 673, 690 (D. Kan. 1998).

In this case, the Plan provides that the stock interest of Klosterman will not be altered. Stock is property "[e]ven where debts far exceed the current value of assets." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 207-208 (1988). Thus, because unsecured creditors are not being paid in full, the Plan violates the absolute priority rule unless the new value corollary/exception to the rule applies.

In *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106 (1939), the Supreme Court recognized that there are circumstances where it may be necessary to seek "new money 'essential to the undertaking' from the old stockholders." *Id.* at 121. "Where that necessity exists and the old stockholders make a fresh contribution and receive in return a participation reasonably equivalent to their contribution," the Court found that the absolute priority rule enunciated by it in earlier cases was not violated. *Id.* In *Case*, the bankruptcy court had confirmed a plan that permitted shareholders to retain an interest in the company, the

15

consideration for which was the stockholders financial standing and influence in the community and continuity of management. *Id.* at 122. The Supreme Court reversed, holding that 'the stockholder's participation must be based on a contribution in money or in money's worth." *Id.* The Court found that the items constituting the stockholders' consideration "have no place in the asset column of the balance sheet of the new company. They reflect merely vague hopes or possibilities." *Id.* 122-23.

Under the *Case* rationale, prepetition shareholders may retain stock interests that are reasonably equivalent to their new contribution. As one court noted, "[t]hese interests are not so much 'retained' as purchased for the new value." *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1360 (7th Cir. 1990). Although *Case* is a pre-Code case and the Supreme Court has not definitively resolved the question of whether the "new value" component of the absolute priority rule survived enactment of the Bankruptcy Code and, specifically, § 1129(b)(2)(B)(ii), *see Bank of Am. Nat'l Trust and Sav. Assoc. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 454-55 (1999), the Sixth Circuit has recognized the continued viability of the new value corollary[7] as set forth in *Case. In re Crosscreek Apts., Ltd.*, 213 B.R. 521, 546 (Bankr. E.D. Tenn. 1997) (citing *Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.)*, 800 F.2d 581, 588 (6th Cir. 1986)).

In *Ahlers*, the Supreme Court rejected the argument that the promise of future contributions of labor, experience and expertise constituted money or money's worth as contemplated in *Case*, as such contributions are "intangible, inalienable and, in all likelihood, unenforceable." *Ahlers,* 485 U.S. at 203-04. Citing *Case*, the Court found that such contributions "ha[ve] no place in the asset column of the balance sheet of the new entity." *Id.* at 204. The Court explained that "[u]nlike 'money or money's worth,' a promise of future services cannot be exchanged in any market for something of value to the creditors *today.*" *Id.* (emphasis in original).

In this case, the Plan provides that Klosterman "will invest such funds as are necessary to provide for the payment of administrative and priority claims." [Doc. # 152, p. 12, ¶ 10]. However, at the confirmation hearing, Klosterman testified that such funds will be provided via a loan from the Trust to Debtor, the note for which will be signed by Debtor and co-signed by Klosterman. As security for such loan, the Trust will be granted a lien in all of Debtor's assets. Thus, the Plan does not accurately reflect the

---

[7] Although also referred to as the "new value exception," courts have opined that it is instead a "corollary" to the absolute priority rule based on the language of § 1129(b)(2)(B)(ii) precluding a shareholder from receiving or retaining any property "on account of" their prior ownership interest. *In re Crosscreek Apts., Ltd.,* 213 B.R. 541, 546 n.30 (Bankr. E.D. Tenn. 1997) (citing cases). "These courts maintain that when a prior investor participates in the reorganized company because of a new equity contribution, the investor is not retaining or receiving an interest 'on account of' its old interest, but is in essence purchasing a new interest." *Id.*

method intended for contributing new value to Debtor. In any event, the court finds the proposed "consideration" for Klosterman's retained equity interest in Debtor does not constitute "new value" as contemplated in *Case*.

In *First Bank of Whiting*, the Seventh Circuit rejected an argument that the stockholders guaranteeing a loan to the debtor corporation constituted a contribution of "new value" justifying their retention of stock. *First Bank of Whiting*, 908 F.2d 1362-63. The court found the guarantees no different than the promises of the managers in *Case* and *Ahlers*. *Id.* at 1362. The court explained;

> [Guarantees] are intangible, inalienable, and unenforceable by the firm. [The principals] may revoke their guarantees or render them valueless by disposing of their assets; although a lender may be able to protest the revocation, the debtor cannot compel the guarantor to maintain the pledge in force. Guarantees have "no place in the asset column" of a balance sheet. We do not know whether these guarantees have the slightest value, for the record does not reveal whether [the principals] have substantial unencumbered assets that the guarantees would put at risk. If [the principals] were organizing a new firm in Illinois, they could not issue stock to themselves in exchange for guarantees of loans. . . . Promises inadequate to support the issuance of shares under state law are also inadequate to support the issuance of shares by a bankruptcy judge over the protest of the creditors, the real owners of the firm.

*Id.* Similarly, in *In re Graphic Communications, Inc.*, 200 B.R. 143 (Bankr. E.D. Mich. 1996), the court rejected a "new value" argument where the debtor's majority shareholder guaranteed a contribution of $15,000.00 to cover any shortages in the debtor's cash flow. *Id.* at 151-52. The court found that the plan did not commit the shareholder to any particular contribution and "no evidence that the promise to make up differences in the debtor's cash flow ha[d] any value whatsoever." *Id.*

In this case, Klosterman simply co-signing the loan is not a contribution by him in money or money's worth. Although money may be available to the reorganized Debtor as a result of the loan from the Trust, Debtor will be liable for the entire balance owed and Debtor's assets will be encumbered by a lien securing that loan. Rather than a contribution that enhances the assets of the reorganized Debtor, the new entity will have incurred new liabilities. *See Sunflower Racing, Inc.*, 226 B.R. at 691 ("The infusion of cash by way of a loan generally will not satisfy the new value exception to the absolute priority rule."). Although this case involves a shareholder co-signing a note with Debtor rather than guaranteeing payment, it is the assets of Debtor, not Klosterman, that will secure the debt. There is no evidence that Klosterman's liability under the note brings any value at all to Debtor. As in the cases discussed above, the court finds that Klosterman's "contribution" is "intangible, inalienable, and, in all likelihood, unenforceable" by Debtor and has "no place in the asset column of the balance sheet of the [reorganized Debtor]." *See Ahlers*, 485 U.S. at 204 (citing *Case*, 308 U.S. at 122-23). Moreover, it does not appear that simply co-signing a loan with

17

Debtor is adequate consideration for shares of stock under Ohio law. *See* Ohio Rev. Code § 1701.18(B)(("Promissory notes, drafts, or other obligations of a subscriber or purchaser do not constitute payment for shares."). For the foregoing reasons, Klosterman's contribution does not constitute new value that would permit him to retain an equity interest in Debtor. Debtor, therefore, has not met its burden of showing that the Plan does not violate the absolute priority rule. *See Ahlers*, 485 U.S.. at 206 (stating that "the statutory language and the legislative history of § 1129(b) clearly bar any expansion of any exception to the absolute priority rule beyond that recognized in our cases at the time Congress enacted the 1978 Bankruptcy Code.").

### C. "Fair and Equitable" Nature of South Lake Court Road Plan Provision

The court also considers whether the Plan is "fair and equitable" as required under § 1129(b)(1) in light of the Plan provisions addressing claims relating to the South Lake Court Road. Specifically, the Plan provides that Debtor will remain the title owner of the road and that "[n]o claims of any kind nor shall [sic] any obligation or duty against the Debtor that existed as of the date of the commencement of this case shall survive confirmation of the Plan." [Doc. # 152, p. 10, ¶ 3.3(5)(a)(iii)]. At the confirmation hearing, Debtor's counsel represented to the court that the purpose of this language in the Plan is to preclude any proceedings against Debtor by Mercer County based on Debtor's failure to complete construction of South Lake Court Road. Although § 1129(b)(2) sets forth specific requirements that are "include[d]" in the condition that a plan be "fair and equitable," a "fair and equitable" determination is not limited to considering those requirements. *See* 11 U.S.C. § 102(3) (providing that "'includes' and 'including' are not limiting").

Mercer County objects to confirmation of the Plan, arguing that enforcing its local regulations requiring the proper construction of South Lake Court Road is an exercise of its police power and that its right to enforce those regulations cannot be abolished as attempted by Debtor in its Plan. Mercer County argues that the unfinished South Lake Court Road is a public nuisance and cites the following regulation in support of its authority to file suit against the reorganized Debtor:

§ 1125.05 Penalties

A. Whoever violates any rule or regulation adopted by the Board of County Commissioners for the purpose of setting standards and requiring and securing the construction of improvements within a subdivision or fails to comply with any order pursuant thereto is creating a public nuisance and the creation thereof may be enjoined and maintenance thereof may be abated by action at suit of the County or any citizen thereof. Whoever violates these Regulations shall forfeit and pay not less than $100.00 or more than $1,000.00 for each offense. Each day such violation continues shall be considered a separate offense. Such sum may be recovered with costs in a civil action suit brought in the Court of Common Pleas of Mercer County.

18

[Mercer Ex. A, Mercer County Subdivision Regulations, p. 2356 and Ex. C, p. 59]. It is Debtor's position that Mercer County simply has an unsecured claim with respect to the unfinished road and, because Debtor has no choice but to maintain ownership of the road since no other party is willing to assume ownership, the proposed treatment of Mercer County's claim is fair and equitable.

Unless otherwise provided, confirmation of a Chapter 11 plan "discharges the debtor from any debt that arose before the date of such confirmation. . . whether or not a proof of claim based on such debt is filed or deemed filed. . . ." 11 U.S.C. § 1141(d)(1). A debt is a "liability on a claim," 11 U.S.C. § 101(12), and a "claim" is defined, in relevant part, as a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment," 11 U.S.C. § 101(5)(b).

Assuming, without deciding, that Debtor's failure to complete the construction of South Lake Court Road is a public nuisance as contemplated in § 1125.05 of the Mercer County Subdivision Regulations, Mercer County has a right under that section to equitable remedies for Debtor's breach of performance of its obligations under the Subdivision Regulations that include enjoining maintenance of the nuisance and abatement. Neither Debtor nor Mercer County specifically addressed whether such right gives rise to a right to payment resulting in a claim as defined § 101(5)(b). Section 1125.05 of the Subdivision Regulations provides for imposition of a monetary penalty but does not expressly provide for a right to payment that arises from the equitable remedies set forth in the regulation, *cf.* Ohio Rev. Code § 715.261 (providing authority for a municipal corporation to collect the cost of abating a nuisance); Toledo Municipal Code § 1726.05(d) (providing that the city may recover abatement costs from the owner of property where a public nuisance is found), and it is not clear to the court, and the parties have not addressed, whether such right to payment otherwise exists, *cf. City of Cincinnati v. Deutsche Bank National Trust Co*., – F. Supp. 2d –, 2012 WL 4829372, *6-7 (S.D. Ohio Oct. 10, 2012) (finding that the economic loss doctrine precluded the city from recovering on its common law public nuisance claim the costs it incurred to remediate or demolish properties that the defendant had failed to maintain). Nevertheless, to the extent that Mercer County's right to an equitable remedy under § 1125.05 does give rise to a right to payment, it has a claim within the meaning of § 101(5) that is dischargeable in Debtor's bankruptcy.

However, the Plan provides not only that no claims against Debtor with respect to the South Lake Court Road shall survive confirmation, but also that no *obligation or duty* of Debtor with respect to that property shall survive confirmation. While Debtor's proposed Plan may properly provide for the treatment of claims, the court finds the United States Supreme Court's opinion in *Ohio v. Kovacs*, 469 U.S. 274

19

(1985), instructive, if not controlling, as to a Plan provision that absolves Debtor from any duty or obligation with respect to maintaining a public nuisance after confirmation of the Plan.

In *Kovacs*, the State of Ohio obtained an injunction against Kovacs that required him to, among other things, clean up hazardous wastes from his property. *Id.* at 276. Kovacs failed to comply with his obligation under the injunction and the State obtained the appointment of a receiver, who was directed to take possession of all property and other assets of Kovacs and to implement the cleanup order. *Id.* After the receiver was appointed but before he had completed the cleanup, Kovacs filed a personal bankruptcy petition. *Id.*

Seeking a basis for requiring Kovac's postpetition income to be applied to the cleanup task, the State argued that Kovac's obligation to clean up the property was not dischargeable because it was not a debt within the meaning of the Bankruptcy Code. *Id.* at 276-77. After considering the definition of "claim" in § 101, the Supreme Court concluded that the cleanup duty required under the injunction had been reduced to a monetary obligation. In so concluding, the Court noted that rather than prosecuting Kovacs under the environmental laws or bringing civil or criminal contempt proceedings when he failed to comply with the injunction requiring him to clean up the site, a receiver was appointed and took possession of all property and other assets of Kovacs that might have been used by him to comply with the injunction. *Id.* at 282-83. The State conceded that after the receiver was appointed, the only performance sought from Kovac's was the payment of money to defray cleanup costs. *Id.* at 283. "On the facts before it, and with the receiver in control of the site," the Court agreed that the cleanup order had been converted into an obligation to pay money that was dischargeable in bankruptcy. *Id.* However, noting a number of issues that it was not deciding, the Court further explained:

> [W]e do not suggest that Kovacs' discharge will shield him from prosecution for having violated the environmental laws of Ohio or for criminal contempt for not performing his obligations under the injunction prior to bankruptcy. . . . [W]e do not hold that the injunction against bringing further toxic wastes on the premises or against any conduct that will contribute to the pollution of the site or the State's waters is dischargeable in bankruptcy; we here address, as did the Court of Appeals, only the affirmative duty to clean up the site and the duty to pay money to that end. Finally, we do not question that anyone in possession of the site-whether it is Kovacs or another in the event the receivership is liquidated and the trustee abandons the property, or a vendee from the receiver or the bankruptcy trustee-must comply with the environmental laws of the State of Ohio. Plainly, that person or firm may not maintain a nuisance, pollute the waters of the State, or refuse to remove the source of such conditions. As the case comes to us, however, Kovacs has been dispossessed and the State seeks to enforce his cleanup obligation by a money judgment.

*Id.* at 284.

The court reads the explanation in *Kovacs* to preclude Debtor from including provisions in its proposed Plan that shield it from any obligation it may have under the Subdivision Regulations to abate a nuisance to the extent that a nuisance exists post-confirmation. *See In re CMC Heartland Partners*, 966 F.2d 1143, 1146 (7th Cir. 1992) (citing *Kovacs* and stating that "[h]aving been a debtor in bankruptcy does not authorize a firm to operate a nuisance today . . . or otherwise excuse it from complying with laws of general application."); *Torwico Elec., Inc. v. New Jersey Dept. of Envtl. Protection (In re Torwico Elec., Inc.)*, 8 F.3d 146, 150 (3d Cir. 1993) (citing *Kovacs* and stating that "a debtor cannot maintain an ongoing nuisance in direct violation of state environmental laws"). Where an entity creates a nuisance and thereafter remains in control and permits the nuisance to remain, the nuisance constitutes a continuing course of conduct. *State v. Swartz*, 88 Ohio St. 3d 131, 135 (2000); *cf.* Ohio Rev. Code § 3767.02(A) (providing that the owner or any person in control of a nuisance is guilty of maintaining a nuisance). In this case, the proposed Plan provides that Debtor will remain the owner and, thus, in control of, South Lake Court Road. In accordance with the direction provided in *Kovacs*, the proposed Plan provision that no obligation or duty of Debtor with respect to South Lake Court Road that existed on the date this case was commenced shall survive confirmation of the Plan is not a proper plan provision. The effect of such provision would be to absolve Debtor from compliance with the Subdivision Regulations after confirmation of the Plan and permit it to continue to maintain a public nuisance, to the extent the unfinished road constitutes such a nuisance, an outcome that would be clearly at odds with the direction provided in *Kovacs*.

**THEREFORE**, because Debtor has not met its burden of demonstrating that the requirements for confirmation have been met, for all of the foregoing reasons, good cause appearing,

**IT IS ORDERED** that Debtor's Motion for Cramdown and Approval of Plan [Doc. # 173] be, and hereby is, **DENIED**.

###

11-35180-maw    Doc 227    FILED 08/29/13    ENTERED 08/29/13 15:49:08    Page 21 of 21